IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON


JAMES H. DOBBINS,

         Plaintiff,


vs.                                    Civil Action No. 2:04-cv-01180


JO ANNE B. BARNHART,
Commissioner of Social
Security,

         Defendant.


PROPOSED FINDINGS AND RECOMMENDATION

         This is an action seeking review of the final decision of the
Commissioner of Social Security denying the Claimant's application
for Supplemental Security Income ("SSI") under Title XVI of the
Social Security Act, 42 U.S.C. §§ 1381-1383f.   This case was
referred to this United States Magistrate Judge by standing order
to consider the pleadings and evidence, and to submit proposed
findings of fact and recommendation for disposition, all pursuant
to 28 U.S.C. § 636(b)(1)(B).   Presently pending before the court
are Plaintiff's Motion for Summary Judgment and Defendant's Motion
for Judgment on the Pleadings.

         Plaintiff, James H. Dobbins (hereinafter referred to as
"Claimant"), filed an application for SSI on July 22, 2002,
alleging disability as of June 15, 2002, due to a back injury,

depression and anxiety, and arthritis. (Tr. at 51, 61.)  The claim was denied initially and upon reconsideration. (Tr. at 31, 37.) On April 16, 2003, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 40.)  The hearing was held on September 5, 2003 before the Honorable Theodore Burock. (Tr. at 331-64.)  By decision dated March 23, 2004, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 13-22.)  The ALJ's decision became the final decision of the Commissioner on September 24, 2004, when the Appeals Council denied Claimant's request for review. (Tr. at 4-7.)  On November 1, 2004, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 1382c(a)(3)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 416.920 (2004). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 416.920(a). The first

2

inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 416.920(f) (2004). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

3

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 14; Finding No. 1, tr. at 21.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of lumbosacral disc disease, depression, and anxiety. (Tr. at 15; Finding No. 2, tr. at 21.) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 15; Finding No. 3, tr. at 21.) The ALJ then found that Claimant has a residual functional capacity for medium work, reduced by nonexertional limitations. (Tr. at 19; Finding No. 5, tr. at 21.) As a result, Claimant cannot return to his past relevant work. (Tr. at 19; Finding No. 6, tr. at 21.) Nevertheless, the ALJ concluded that Claimant could perform jobs such as a non-construction laborer, including laundry worker and sales route helper, warehouse worker, and packager, which exist in significant numbers in the national economy. (Tr. at 20; Finding No. 11, tr. at 21-2.) On this basis, benefits were denied. (Tr. at 20; Finding No. 12, tr. at 22.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as

4

> evidence which a reasoning mind would accept
> as sufficient to support a particular
> conclusion. It consists of more than a mere
> scintilla of evidence but may be somewhat less
> than a preponderance. If there is evidence to
> justify a refusal to direct a verdict were the
> case before a jury, then there is 'substantial
> evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting

Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)).

Additionally, the Commissioner, not the court, is charged with

resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d

1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not

abdicate their traditional functions; they cannot escape their duty

to scrutinize the record as a whole to determine whether the

conclusions reached are rational."  Oppenheim v. Finch, 495 F.2d

396, 397 (4th Cir. 1974).

     A careful review of the record reveals the decision of the

Commissioner is not supported by substantial evidence.

Claimant's Background

     Claimant was 49 years old at the time of the administrative

hearing. (Tr. at 335.)  He has an eleventh grade education.  (Tr.

at 337.)  In the past, he worked as a rig hand in the oil wells and

as a track foreman in the railroad industry.  (Tr. at 62.)

The Medical Record

     The court has reviewed all evidence of record, including the

medical evidence, and will discuss it further below as necessary.

     1.   Mental Impairments

5

Claimant sought treatment for depression and panic attacks in 2002.  His family physician, Steven Craft, D.O., managed these conditions with Xanax, Zoloft, Wellbutrin, and Paxil. (Tr. at 281-3, 205, 223.)

On August 23, 2002, Dr. Craft completed a general physical form at the request of the DHHR.  (Tr. at 140-1.) He opined that due to depression Claimant had a "very poor ability to socialize and be around people without [experiencing] panic attacks." He stated that until Claimant's psychiatric problem improved, Claimant could not tolerate most any work situation and be reliable.  (Tr. at 140-1.)  He indicated that Claimant needed psychiatric treatment. (Tr. at 141.)[1]

Claimant was evaluated by Scott Spaulding, M.A. at the request of West Virginia Disability Determination Service on September 17, 2002. (Tr. at 112-6.) Upon mental status examination and interview, Claimant appeared credible and reported being treated for anxiety, depression, back pain, and panic attacks.  (Tr. at 112-3.)  He described intolerance for being around more than 2 to 3 people at a time, constant worry, feelings of uselessness and worthlessness, sleep disturbances, decreased appetite, weight loss, and crying spells.  He entertained suicide but had no plan.  (Tr. at 113.) Claimant was taking Paxil and Xanax for this condition.  (Tr. at

_____

[1] The physical findings from this exam are discussed in section (2).

6

114.)  His  daily  activities  included  cleaning  and  sweeping  his
camper,  talking  to  his  parents  for  some  2  hours,  playing  video
games,  and  visiting  his  brother.    He  did  his  own  laundry  once  a
week.  (Tr.  at  115.)    Mr.  Spaulding  noted  good  eye  contact  and
rapport,  relevant  and  coherent  speech,  solemn  mood  and  constricted
affect,  and  no  apparent  thought  or  psychomotor  disturbances.  (Tr.
at  115.)   Claimant's  immediate  and  remote  memory  were  intact,  but
his  delayed  memory  was  severely  deficient.   Claimant's  attention
and  concentration  were  mildly  deficient.   His  judgment  and  insight
were  intact.  Mr.  Spaulding  diagnosed  general  anxiety  disorder;
major  depressive  disorder,  single  episode,  moderate;  and  panic
disorder  with  agoraphobia.  (Tr.  at  115.)  He  found  that  Claimant's
persistence  was  normal,  but  his  pace  was  mildly  deficient.
Claimant's  social  functioning  was  moderately  deficient.  (Tr.  at
116.)

State  agency  source  Rosemary  L.  Smith,  Psy.D.  reviewed
Claimant's  file  and  completed  a  Mental  Residual  Functional  Capacity
Assessment  form  on  October  22,  2002.  (Tr.  at  187-9.)  She  opined
that  while  Claimant  had  moderate  limitations  in  his  ability  to
maintain  attention  and  concentration  for  extended  periods  and  his
ability  to  interact  appropriately  with  the  general  public,  he  had
no  other  significant  limitations.   She  stated  that  Claimant  had  the
ability  to  learn  and  perform  a  variety  of  work-like  activities.
(Tr.  at  188-9.)  These  opinions  were  affirmed  by  Debra  K.  Lilly,

7

Ph.D. on March 15, 2003.  (Tr. at 187.)

Dr. Smith also completed a Psychiatric Review Technique form on the same date.  She indicated that Claimant suffered a major depressive disorder, a generalized anxiety disorder, and a panic disorder.  (Tr. at 174, 176.)  He had mild restriction in his activities of daily living, and moderate difficulties in maintaining social functioning, concentration, persistence, and pace; however, these did not meet or equal a Listing.  (Tr. at 181-2.)  These findings were also affirmed by Dr. Lilly on March 15, 2003.  (Tr. at 171.)

On August 21, 2003, just prior to the hearing in this case, Claimant visited supervised psychologist Janice Blake, M.A.  (Tr. at 240-4.) He reported depressive symptoms and worry, inability to sleep, irritability, social withdrawal and suicidal ideation, and poor concentration and memory.  (Tr. at 240.) Dr. Blake observed an elevated level of anxiety and a depressed mood, but normal stream of thought.  Claimant reported suicidal ideation with no plan.  His immediate memory functions were intact; however, delayed memory functions were moderately impaired.  His intelligence appeared to be in the average to low-average range.  (Tr. at 242-3.)

On the Beck Depression Inventory, Claimant's symptoms ranked in the moderate range and correlated with his self-reports.  His score on the Beck Anxiety Inventory revealed a mild range of anxious symptoms.  The Minnesota Multiphasic Personality Inventory-

2 (MMPI-2) results correlated with Claimant's reports of anxiety and depression.  (Tr. at 243.)   Ms. Blake opined that Claimant suffered adjustment disorder with depressed mood; panic disorder without agoraphobia (in remission for two years); and a generalized anxiety disorder.  She scored Claimant's GAF at 55. (Tr. at 244.)

On a Mental Impairment Questionnaire, Ms. Blake indicated that Claimant's ability to understand and remember very short and simple instructions and his ability to remember work-like procedures were slightly limited. (Tr. at 245.)   His ability to ask simple questions or request assistance was also slightly limited. Claimant was moderately limited in his ability to make simple work-related decisions and to set realistic goals or make plans independently of others.  (Tr. at 246, 247.)  He was markedly limited in his ability to understand, remember, and carry out detailed instructions, to work in coordination with or proximity to others without being unduly distracted by them, and to maintain socially appropriate behavior or basic standards of neatness and cleanliness.  (Tr. at 245-6.) He was also markedly limited in his ability to respond appropriately to changes in a routine work setting, to travel in unfamiliar places, and to use public transportation.  (Tr. at 247.) He was extremely limited in his ability to maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without supervision, and in his ability to maintain attention for extended

9

periods.  He was also extremely limited in his ability to complete a normal work day and week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. at 246.)  He was extremely limited in his ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and his ability to get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes.  (Tr. at 246.)

Ms. Blake indicated that Claimant's psychiatric condition could not reasonably be expected to exacerbate any pain originating from physical conditions.  (Tr. at 247.)

While this report was not available at the time of the hearing, the ALJ held the record open in order to consider it post-hearing.  (Tr. at 363; 248 (cover letter indicating report mailed to ALJ September 22, 2003.))

Also following the hearing, on October 2, 2003, Dr. Craft completed a second general physical form which addressed both Claimant's physical and mental complaints.[2]  He indicated that Claimant's depression would disable him from even sedentary work, and that Claimant was precluded from all work.  He opined that Claimant could not ever return to work.  (Tr. at 288.) This report

---

[2] The physical findings from this exam are discussed in section (2).

was submitted to the Appeals Council.  (Tr. at 278.)

Physicians at Roane General Medical Clinic diagnosed anxiety/depression in December 2003, and continued to prescribe Paxil through February 2004.  (Tr. at 318.) These records were also submitted to the Appeals Council.  (Tr. at 296.)

   *2.  Physical Impairments*

At the general physical performed on August 23, 2002, Steven Craft, D.O. recorded Claimant's complaints of low back pain and limitations.  Dr. Craft diagnosed hypertension, depression, panic attacks, lumbar DJD, and hearing impairments. Dr. Craft further opined that Claimant could not tolerate more than light to sedentary work due to lumbar pain. (Tr. at 287-8.)

Claimant underwent evaluation by Nilima Bhirud, M.D. at the Commissioner's request on October 6, 2002.  (Tr. at 123-7.) He reported an on-the-job injury in 1988 which resulted in pain that had never subsided.  Claimant had not been to a pain clinic or a specialist.  He was managing his arthritis symptoms with Naproxen prescribed by his family doctor.  Claimant indicated that the pain radiated into his left leg, and was worsened by prolonged standing or sitting (beyond 10 minutes) or walking beyond one block.  (Tr. at 123.) During the exam, Claimant had a normal gait, could stand on each foot at a time, and was able to heel-walk, toe-walk, and squat.  Dr. Bhirud observed that he was comfortable in both sitting and standing positions.  (Tr. at 124.)  Claimant had mild lumbar

11

tenderness but negative straight leg raising tests on both sides. He was able to flex forward to 70 degrees. (Tr. at 125.)

State agency medical source Marcel Lambrechts, M.D. completed a Physical Residual Functional Capacity Assessment form on October 24, 2002. (Tr. at 129-36.) Dr. Lambrechts opined that Claimant's symptoms were out of proportion to the physical findings. He found no reason why Claimant could not engage in a "good range" of medium work activity. (Tr. at 134.)

Claimant treated with Dr. Craft from December 10, 2002 through July 10, 2003. (Tr. at 196-211.) Dr. Craft medically managed Claimant's back pain and referred him for treatment at The Day Surgery Pain Management Center in January, 2003. (Tr. at 205-9.)

State agency medical source Uma Reddy, M.D. completed a Physical Residual Functional Capacity Assessment on March 7, 2003. (Tr. at 162-9.) It is not clear what records Dr. Reddy reviewed, as the only ones noted were a January 23, 2002 office visit and the MRI results of 2002. (Tr. at 169.) Dr. Reddy opined that Claimant's allegations "are only minimally supported by medical evidence. This RFC is consistent with the previous, even with new medical evidence." (Tr. at 167.)

On the same date as Dr. Reddy's review (March 7, 2003), Dr. Craft began prescribing hydrocodone, which he later increased from 7.5 milligrams to 10 milligrams. (Tr. at 197-205.) Around the same time, on March 3 and 24, 2003, Claimant underwent epidural steroid

12

injections of his L4-5 vertebrae at the Day Surgery Pain Management Center, as recommended by Dr. Craft.  (Tr. at 267-8, 209.) Notes of Center physician Gai L. Smythe, M.D. state that Claimant had degenerative lumbar disc disease and "probable facet arthropathy". (Tr. at 267.)  Dr. Smythe stated that Claimant had an emotional component and possible cognitive component to his pain.  (Tr. at 267.)   She recommended and Claimant underwent a left L5 transforaminal epidural steroid injection on April 10, 2003.  (Tr. at 264.) At that time, she commented upon Dr. Craft's use of hydrocodone for Claimant's pain relief:

> From patient's description, i[t] sounds as though Dr. Craft is currently providing these medications in complete compliance with the 1997 guidelines set [ ] by the West Virginia State Board of Medicine for chronic use of opiates in nonmalignant pain.  The use of the medications and the prescriptive oversight seem to be caring, compassionate and comprehensive.  I see no reason why such care should not be validated.

(Tr. at 264.)

Unfortunately, the injections did not provide satisfactory relief, and a diagnosis of facet arthropathy was added on May 14, 2003.  Facet injections (medial branch nerve blocks) were then deemed appropriate and were administered on June 5, 2003. (Tr. at 262-3.) Diagnoses at that time included lumbar degenerative disc disease, intermittent lumbosacral radiculitis, and lumbar facet spondylosis without myelopathy. (Tr. at 262.) Even after this procedure, however, Claimant requested additional pain medications.

13

(Tr. at 262.) At the next visit, Claimant stated that he found these injections extremely painful and that he declined to continue this treatment.  (Tr. at 260.)

Claimant saw Dr. Craft in August 2003. (Tr. at 281.) Dr. Craft maintained the prescription of hydrocodone. (Tr. at 284.) Dr. Craft then completed a second general physical form on October 2, 2003, following the hearing in this case. (Tr. at 287-8.) He indicated that Claimant was unable to do any lifting or to sit or stand longer than 30 minutes. He stated that Claimant could never return to work and was precluded from all work situations, due to psychological and physical conditions.  (Tr. at 288.)  These records were mailed to the Appeals Council in July, 2004. (Tr. at 278.)

Also post-hearing, Claimant sought treatment from the Roane General Medical Clinic from December 2003 through June 2004.  (Tr. at 310-25.)  He was diagnosed with degenerative disc disease of his lumbar spine and was prescribed Percocet and hydrocodone.  (Tr. at 310, 313-4, 318-9, 325.)  These records were mailed to the Appeals Council on August 12, 2004. (Tr. at 296.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ failed to properly assess Claimant's pain and credibility, resulting in an inadequate hypothetical to the vocational expert; (2) the ALJ's

14

findings as to Claimant's back limitations and panic disorder were not supported by substantial evidence; and (3) the ALJ improperly denied Claimant's request for a supplemental hearing. (Pl.'s Br. at 3-10.)   The Commissioner responds that the ALJ properly evaluated Claimant's physical and mental complaints; that his decision was supported by substantial evidence in all respects; and that a supplemental hearing was not warranted. (Def.'s Br. at 7-11.)

A two-step process is used to determine whether a claimant is disabled by pain.  First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain alleged.  20 C.F.R. § 416.929(b) (2004); SSR 96-7p, 1996 WL 374186 (July 2, 1996); see also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).   If such an impairment is established, then the intensity and persistence of the pain and the extent to which it affects a claimant's ability to work must be evaluated.  Craig, 76 F.3d at 595.  When a claimant proves the existence of a medical condition that could cause pain, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence."  Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative.

15

Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990).  A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. § 416.929(c)(4)(2004).  Additionally, the regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons. . . . Factors relevant to your symptoms, such as pain, which we will consider include:
>
> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
>
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 416.929(c)(3)(2004).

SSR 96-7p repeats the two-step regulatory provisions. However, while Craig and SSR 96-7p provide that an ALJ may look for

16

objective medical evidence of an impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself. <u>Craig</u>, 76 F.3d at 585, 594; SSR 96-7p, 1996 WL 374186, at *2 ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. <u>Craig</u>, 76 F.3d at 595. As such, while <u>Craig</u> does not prevent an ALJ from considering a lack of objective evidence of pain or a lack of other corroborating evidence, it does prohibit the ALJ from rejecting allegations of pain <u>solely</u> because the pain itself is not supported by objective medical evidence.

In this case, the ALJ determined that Claimant met the threshold test in that he produced evidence of an impairment that could reasonably be expected to cause the alleged symptoms. (Tr. at 16.) However, the ALJ found that Claimant was not credible concerning the intensity and persistence of his pain because "the objective medical findings and medical treatment does not support the [C]laimant's testimony of disabling limitations....the [C]laimant's overall treatment has been conservative and reveals

17

less than impressive objective findings, which does not support his testimony of disabling limitations." (Tr. at 16.)

This suggests to the court that the ALJ may have relied too heavily upon objective findings, contrary to the mandates of <u>Craig</u>, <u>Mickles</u>, and <u>Hyatt</u>, supra.  A review of the record also shows that the ALJ mischaracterized Claimant's course of treatment for pain relief, and failed to consider information from one of his treating physicians.

The ALJ noted that Claimant's MRI results indicated only degenerative changes with minimal protrusion of the discs at L4-5 and L5-S1, and that upon consultative examination with Dr. Bhirud in October 2002, Claimant could heel-walk, toe-walk, squat, and flex forward to 70 degrees.  (Tr. at 16, <u>citing</u> tr. at 125.) While it was proper to consider this objective evidence as part of the analysis, as stated above, <u>Craig</u> prohibits an ALJ from rejecting a Claimant's complaints of pain solely due to lack of objective indicators; instead, the <u>entire record</u> must be considered in determining Claimant's credibility as to pain.   <u>Craig</u>, 76 F.3d at 585, 594; SSR 96-7p, 1996 WL 374186, at *2.

In this case, following this recitation of objective evidence, the ALJ summarily stated that Claimant "began receiving injections in 2003 and has been prescribed pain medication." (Tr. at 16.) This characterization grossly understates the evidence and fails to analyze the factors set forth in 20 C.F.R. § 416.929(c).  For

instance, Claimant underwent not only epidural injections, but also facet injections, both of which proved to be very painful and provided only minimal relief. (Tr. at 213-21.) The ALJ refers to these only as "injections" and does not discuss the frequency or nature of them. Next, in the course of administering these injections in May, 2003, Claimant's treating physician, Gai L. Smythe, M.D., diagnosed facet arthropathy, which she stated was "certainly consistent with [Claimant's] physical examination and history." (Tr. at 216.) Dr. Smythe also specifically stated that she had no suspicion of abuse, thwarting, or diversion. (Tr. at 216.)

The ALJ did not discuss this new diagnosis nor Dr. Smythe's comments. Although he acknowledged his duty to consider medical opinions from acceptable sources reflecting judgments about the nature and severity of Claimant's impairments/limitations under 20 C.F.R. § 416.927, SSR 96-2p and 96-6p, the ALJ failed to do so with respect to Dr. Smythe.  (Tr. at 15-6.) Moreover, the court notes that not only is Dr. Smythe a medical doctor, an acceptable medical source defined by 20 C.F.R. 416.913(a)(1)(2004)(tr. at 213-4), but she is a treating physician, such that her opinions may be afforded controlling weight if properly supported and if consistent with the remainder of the record.   Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 416.927(d)(2)(2004).  Yet the ALJ does not discuss Dr. Smythe's notes in any detail, much

less her diagnosis of facet arthropathy, her comments as to Claimant's credibility, or the fact that she considered opiate medication and recommended Methadone. Nor does he consider Dr. Smythe's comment that Claimant likely had an emotional component, and possibly a cognitive component, to his pain. The ALJ does not state the weight he ascribed to any of Dr. Smythe's opinions. From this, the court can only conclude that the ALJ did not give adequate consideration to the notes of Dr. Smythe.

The ALJ also failed to consider the type, dosage, effectiveness and side effects of the Claimant's medications as required by 20 C.F.R. § 416.929(c)(iv). Claimant's medications included hydrocodone, which he began taking in March 2003, and which Dr. Craft increased to 10 milligrams in July 2003. (Tr. at 196-205.) Hydrocodone should not be simply labeled "pain medication" and dismissed; it is an opioid medication qualitatively similar to codeine. It is indicated for relief of moderate to moderately severe pain. Physician's Desk Reference, 58th Ed., 2004, (Lortab Tablets), p. 3235-6.

Furthermore, not just Dr. Craft, but two other treating physicians believed strong pain medications were indicated. Dr. Smythe considered a chronic daily opiate regimen. Her notes reflect that she declined to make such prescription due to Claimant's anticipated need for such medication over the next 30-40 years. (Tr. at 213.) Instead, Dr. Smythe recommended Methadone.

(Tr. at 214.)  Records submitted to the Appeals Council reflect that a physician at Roane General Medical Clinic prescribed hydrocodone and Percocet.  (Tr. at 310-25.)  Percocet is qualitatively similar to morphine and, like hydrocodone, is indicated for the relief of moderate to moderately severe pain. Physician's Desk Reference, 58th Ed., 2004, p. 1245.

For the ALJ and Appeals Council to summarily dismiss Claimant's complaints of pain without analysis of the above evidence was error. While mindful that we are not permitted to weigh the evidence and substitute judgment, in this case, the ALJ committed reversible error in failing to discuss treatment by one of Claimant's treating physicians and failing to analyze those factors set forth in the regulations above.

The court notes that instead, the ALJ relied exclusively upon state agency medical source opinions with respect to Claimant's physical limitations.  These sources opined that Claimant could engage in medium level work. (Tr. at 18.)  This would appear at first glance to be substantial evidence supporting the ALJ's decision.  However, the first of these reviews occurred in October 2002, prior to Claimant's initiation of treatment with Dr. Smythe, and prior to many of Dr. Craft's visits.  The second of these, by Dr. Reddy on March 7, 2003, was dated on the same day Dr. Craft deemed hydrocodone appropriate, and so obviously did not consider that finding or any of the visits thereafter.  The March 7, 2003

21

review also does not indicate whether Dr. Smythe's findings were considered at all, and indeed, given the timing of Claimant's visits, the reviewer would have lacked some, if not all, of those records. (See tr. at 267-9, indicating dates of treatment on February 11, March 3, and March 24, 2003; see also tr. at 248, indicating counsel forwarded these to Appeals Council on September 22, 2003.)

Even the opinions of highly qualified experts are only as good as their foundations. Dr. Reddy's review references only 1 office visit and the MRI results.  Insofar as it appears these reviews were based on incomplete information, the ALJ's reliance upon them was faulty.

Next, the record indicates in two places that Claimant's anxiety played a role in his limitations. Ms. Blake and Dr. Kampsnider wrote, "[Claimant] reported no panic attacks for 2 years, yet continues to be anxious which has prevented functioning such as driving a car and remaining independent." (Tr. at 247.) Dr. Smythe stated that Claimant had an emotional component and possibly a cognitive component to his pain. (Tr. at 267.)  The ALJ did not address either of these comments.  Instead, the ALJ rejected all of Claimant's psychological evidence, chiefly because he deemed Claimant not credible with respect to his physical limitations: "This lack of credibility in regard to the [C]laimant's physical symptoms and limitations raises questions as

22

to his credibility regarding his allegations of significant psychological problems...."(tr. at 16); "The undersigned notes that in regard to the testing instruments the Beck Depression Inventory and the Beck Anxiety Inventory relies on self report of subjective complaints and the [C]laimant, as noted above, is not credible...."(tr. at 17); "The [C]laimant's lack of credibility in regard to his physical problems also makes his allegations of having disabling psychological limitations questionable...."(tr. at 17); "The undersigned rejects this assessment by Ms. Blake and Dr. Kampsnider as it is based on the [C]laimant's subjective complaints..."(tr. at 18.)

The ALJ did offer additional reasons for discounting Claimant's psychological evidence. However, the repetition in the above statements raises suspicion that the ALJ engaged in some degree of "bootstrapping" of Claimant's mental limitations to his physical impairments, as Claimant argues in Brief. (Pl.'s Br. at 8.) Thus, to the extent that the ALJ erred in his analysis of Claimant's physical pain and credibility as described above, those errors would have also tainted his analysis of Claimant's mental impairments, since the ALJ hinged that portion of his decision upon Claimant's credibility.

In fact, the ALJ discredited the opinions of every treating source because he found Claimant's doctors relied upon Claimant in forming their opinions. He rejected Dr. Craft's opinions for this

reason.  (Tr. at 19.)  Next, despite the fact that Ms. Blake and Dr. Kampsnider's review spanned some 4 hours (tr. at 344) and incorporated tests such as the Beck Depression Inventory, Beck Anxiety Inventory, and MMPI-2, the ALJ totally discredited these findings, stating that they were based upon Claimant's subjective statements. (Tr. at 17.)  He also rejected the Mental Assessment Form completed by Ms. Blake and Dr. Kampsnider because it was "based upon [C]laimant's subjective complaints." (Tr. at 17-8.)

Strangely, however, the ALJ adopted the findings of Scott Spaulding, M.A. who stated that Claimant was "credible." (Tr. at 112.)  Mr. Spaulding opined that Claimant needed treatment and intervention. (Tr. at 115; "[p]rognosis is fair *with treatment and intervention*".) It is highly unlikely that Mr. Spaulding would have called Claimant "credible" or recommended such a course if he believed Claimant was malingering as the ALJ suggests.

As Claimant argues, the ALJ's findings as to Claimant's mental and physical complaints shaped his hypothetical question:

> First hypothetical, assuming an individual of the claimant's age, education, work experience, who has a residual functional capacity for medium work, nonexertionally limited to routine repetitive tasks, involving only incidental public contact.  No exposure to hazards, such as unprotected heights, dangerous equipment, occasional climbing, balance, stoop, kneel, crouch, crawl. Under this first hypothetical are there any unskilled jobs [this] individual could perform?

(Tr. at 357.)

24

In response to this question, the VE named several available jobs. (Tr. at 358.)   The ALJ then incorporated the limitations prescribed by Ms. Blake and Dr. Kampsnider's report.   With those restrictions, the VE testified that no jobs would be available. (Tr. at 359.) Hence, as before, if the ALJ erred in his credibility finding, this finding tainted his view of both Claimant's physical and mental limitations, and directly tainted the hypothetical question as well.   A full rehearing is necessary in order to completely correct these problems.

Claimant's point that a medical expert should have been called is also well-taken.   The court notes vast conflicts in the evidence between the opinions of Claimant's treating doctors (twice stated) that he is unable to engage in any form of work, versus the opinions of state agency medical sources who recommended medium level work.   The court notes also the vast divergence between state agency medical sources and the findings of Ms. Blake and Dr. Kampsnider (the "Blake/Kampsnider report"). (Tr. at 171-90; 240-7.) Compare, for example, the following ratings:

- --- ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. Dr. Smith found not significantly limited; Blake/Kampsnider found extremely limited. (Tr. at 187, 246.)

- --- ability to sustain routine without supervision. Smith found not significantly limited; Blake/Kampsnider found extremely limited. (Tr. at 187, 246.)

--- <u>ability to maintain attention and concentration for extended periods</u>. Smith found moderately limited; Blake/Kampsnider found extremely limited. (Tr. at 187, 246.)

--- <u>ability to complete a normal workday and work week and to maintain consistent pace</u>. Smith found not significantly limited; Blake/Kampsnider found extremely limited. (Tr. at 188, 246.)

--- <u>ability to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers and peers without undue distraction, and to act in socially appropriate ways in the workplace</u>. Smith found not significantly limited, Blake/Kampsnider found extremely limited, except for the latter, which was markedly limited. (Tr. at 188, 246.)

While not an exhaustive list, the above exemplifies the wide differences in opinion on several key issues. A medical expert should be employed to resolve these and other major differences between the reports.

Upon remand, the ALJ should consider <u>all</u> records pertaining to Claimant's physical and mental conditions, and should analyze them in full compliance with 20 C.F.R. §419.929. The court agrees with Claimant that a second hearing, at which a qualified medical expert would address the inconsistencies between the findings of the state agency medical sources and Claimant's treating physicians, is appropriate. Should the residual functional capacity assessment be modified in any way, a vocational expert should also be called at this hearing. Ultimately, of course, the Commissioner has the authority to determine the extent of the hearing.

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the Plaintiff's Motion for Summary Judgment to the extent that he seeks a remand, **DENY** the Defendant's Motion for Judgment on the Pleadings, **REVERSE** the final decision of the Commissioner, and **REMAND** this case for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Judge Copenhaver.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then ten days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Copenhaver, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to counsel of record.

<u> November 9, 2005 </u>
Date

_Mary E. Stanley_
Mary E. Stanley
United States Magistrate Judge